**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 18, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSE ANTONIO BRISENO and JOSE
ALONSO URIBE RODRIGUEZ,

Defendants-Appellants.

Nos. 03-8099, 04-8001
(District of Wyoming)
(D.C. No. 03-CR-10-D)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **MURPHY** and **McCONNELL**, Circuit Judges.

## I. INTRODUCTION

After examining the briefs and appellate records, this panel has determined

unanimously to honor the parties' request for decisions on the briefs without oral

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(A)(2).  The cases are therefore ordered submitted without oral argument.

Jose Antonio Briseno and Jose Alonso Uribe Rodriguez each entered a conditional guilty plea to a single count of conspiracy to possess with intent to distribute methamphetamine and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(D), and 846.  Both reserved the right to appeal the district court's denial of their motions to suppress as fruits of an illegal search the drugs underlying the charges.  *See* Fed. R. Crim. P. 11(a)(2).  Briseno's and Rodriguez's arrest and prosecution grew out of a roadside search of a vehicle, which led to the discovery of significant quantities of marijuana and methamphetamine.  On appeal, they assert the roadside detention was unreasonably long and the consent to search was not voluntarily given.

In addition, Rodriguez argues the district court erred in calculating his sentence based on both the marijuana and methamphetamine, instead of only the marijuana.  In particular, Rodriguez argues that because the factual basis of the plea only included his knowledge of the marijuana, the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and this court's decision in *United States v. Jones*, 235 F.3d 1231 (10th Cir. 2000) mandate that his sentence be calculated solely with regard to the marijuana.

Upon review, this court concludes the various contentions advanced by both Briseno and Rodriguez on appeal are without merit. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court in full.

## II. BACKGROUND

*A. Roadside Stop*

*1. Factual Background*

On January 12, 2003, Wyoming Highway Trooper Ron Jones stopped a white Suburban because it had no visible registration. As Jones approached the Suburban, he noticed what appeared to be a temporary registration in the rear window; the temporary registration was not previously visible to Jones because of the dark tint of the Suburban's windows. At Jones' request, the driver of the Suburban, Jose Alonso Uribe Rodriguez, produced a Washington driver's license. Jones noticed that both Rodriguez and his passenger, Jose Antonio Briseno, were wearing necklaces with a Jesus Malverde emblem and that a similar necklace was hanging from the Suburban's rearview mirror. Based on his experience and training, Jones recognized the Jesus Malverde emblem as being associated with drug dealers.

Pursuant to his standard practice, Jones asked Rodriguez to exit the Suburban and accompany him to the patrol car. Jones asked Rodriguez where he and Briseno were traveling; Rodriguez responded that they were traveling to Iowa. Jones and Rodriguez continued the conversation in the patrol car while Jones checked Rodriguez's driver's license and filled out a warning ticket for improper display of the vehicle registration. During this conversation, Rodriguez indicated that Briseno was the owner of the Suburban. He initially indicated that he and Briseno had been in Reno for a week visiting family, but later stated they had only been in Reno for about three days to gamble.

While Rodriguez remained in the patrol car, Jones approached the passenger side of the Suburban, opened the door, and began to converse with Briseno. Briseno confirmed that the Suburban belonged to him and produced an Iowa driver's license. When Jones asked Briseno about his and Rodriguez's travel itinerary, Briseno indicated they had been in Reno gambling for about two weeks. Briseno further indicated that although both he and Rodriguez had family in Iowa, neither had any family in Reno.

When he returned to the patrol car to run a check on Briseno's license, Jones asked Rodriguez about the inconsistencies between his and Briseno's stories regarding the pair's travel plans. Rodriguez became evasive and offered

no explanation. Jones also asked Rodriguez about the Jesus Malverde necklaces. Rodriguez responded that the necklaces depicted a religious figure in Mexico.

At 4:54 p.m., approximately eighteen minutes after the initial stop, Jones had Rodriguez exit the patrol vehicle. Jones returned all the paperwork previously provided by both Rodriguez and Briseno, issued a warning ticket, and asked Rodriguez if he had any questions. When Rodriguez responded that he did not have any questions, Jones asked Rodriguez if he would be willing to answer a few additional questions. Rodriguez answered in the affirmative. Jones then asked Rodriguez if there were any weapons, drugs, or large amounts of cash in the vehicle. Rodriguez stated that none of those items were in the vehicle. Jones next asked Rodriguez if he could search the Suburban. Rodriguez replied that it was okay with him as long as Briseno agreed. After Briseno agreed to allow Jones to search the vehicle, Jones asked him to exit the vehicle. Jones conducted a pat down of Briseno when he exited the vehicle and directed Briseno to stand with Rodriguez next to a second trooper who had arrived on the scene to provide backup.

During the search of the Suburban, Jones observed what appeared to be a hidden compartment in the rear wheel well on the passenger side of the Suburban. Jones removed some screws and a plastic cover and observed two large, vacuum-sealed bags containing what appeared to be marijuana. Briseno and Rodriguez

were placed under arrest and the Suburban was taken to the Wyoming Department of Transportation yard. A detailed search of the vehicle revealed a total of nine pounds of marijuana and seven pounds of methamphetamine.

*2. Procedural Background*

Briseno and Rodriguez filed motions to suppress evidence derived from the search of the Suburban. In the motion, Briseno and Rodriguez asserted as follows: (1) their detention was unreasonable in that its scope was not related to the original purpose of the stop; and (2) the consent to the search of the Suburban was not voluntarily given. The district court concluded each of these assertions was without merit and denied the motion to suppress.

As to the claim that Jones had exceeded the scope of the original purpose for the stop, the district court concluded "that all of Trooper Jones' actions prior to issuing the warning ticket and returning the documents he had obtained from Defendants were reasonably related in scope to the circumstances which justified the stop." D. Ct. Order at 6.[1] In the alternative, the district court concluded

---

[1] In support of this conclusion, the district court noted as follows: Defendants do not challenge the initial stop or the subsequent issuance of a warning for failure to properly display the vehicle registration. It was not unreasonable for Defendants to wait eighteen or nineteen minutes while Trooper Jones checked, first, the vehicle registration and Defendant Rodriguez' license and criminal history and second, upon learning that Defendant Briseno was the owner of the vehicle, checked Defendant Briseno's license and criminal

(continued...)

-6-

Jones had sufficient reasonable suspicion of wrongdoing to further detain Briseno and Rodriguez based on "the inconsistent stories regarding Defendants' travel plans, Jones' observation of the necklaces with a Jesus Malaverde symbol, and his observation of only small travel bags even though Defendants had indicated they had been gone for 1-2 weeks." *Id.*

The district court likewise rejected Briseno's and Rodriguez's claim that the consent to search the Suburban was not freely and voluntarily given. *Id.* at 7. The district court found, after reviewing videotape of the encounter and considering the testimony of Jones, that Briseno's command of English was sufficient to allow him to understand he was consenting to a search of the Suburban. The district court likewise found that although Briseno had not specifically stated Jones could remove panels in the Suburban during the course of his search, permission to search such areas was contemplated by the parties.

---

[1](...continued)
history. Trooper Jones testified that dispatch may be assisting 10-12 troopers at any given time. Further it is permissible for Trooper Jones to ask questions relating to Defendants' travel plans and ownership of the vehicle. Upon reviewing the videotape of the stop, the Court saw no evidence that Trooper Jones was stalling in any way or taking an excessive amount of time to perform these tasks reasonably related in scope to the traffic stop. After Trooper Jones returned the documents to Rodriguez, Rodriguez agreed to the trooper asking him more questions; thus, the subsequent encounter was consensual.

D. Ct. Order at 6.

*Id.* (quoting *United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir. 1998) ("One in possession of illegal drugs does not typically leave them out in the open. Consent to an officer's request to search for drugs would reasonably include areas in which one would be expected to hide drugs.")). Finally, the district court rejected the assertion that Briseno's consent to the search was made in response to a coercive show of force on the part of the officers.[2] *Id.* at 7-8.

Having resolved all of the arguments set out in Briseno's and Rodriguez's motions, the district court denied the request to suppress the evidence obtained as a result of the search of the Suburban.

B. *Rodriguez's Guilty Plea and Sentence*

---

[2]The district court found as follows:

> Upon approaching the Suburban to speak with its passenger, Defendant Briseno, Trooper Jones opened the door and leaned his head into the vehicle simply in order to converse with Briseno who was seated in the back seat. There was nothing forceful or coercive about the manner in which Trooper Jones did this. Although 3 other troopers eventually joined Trooper Jones at the scene, only one of the officers came near the Defendants and Trooper Jones' patrol car prior to the search, and none of the troopers unholstered his firearm or displayed any show of force or coercion. The presence of these additional troopers does not necessarily create a coercive environment. Finally, the failure to advise a defendant of his right to refuse consent to search is not determinative of whether the consent was voluntary. Considering the totality of the circumstances, the Court finds that the Defendants' consent was freely and voluntarily given.

D. Ct. Order at 8 (citations omitted).

After the denial of his motion to dismiss, Rodriguez entered into a plea agreement with the government. Rodriguez pleaded guilty to a single count of conspiracy to possess with intent to distribute, and to distribute, more than five hundred grams of methamphetamine, and to possess with intent to distribute marijuana. In exchange for the plea, the two remaining counts in the indictment were dismissed.

The factual basis of Rodriguez's plea was, to say the least, unusual. Although he admitted he knew there were drugs in the Suburban and both marijuana and methamphetamine were found in the Suburban, he asserted he was aware only of the presence of the marijuana. Both counsel for the government and counsel for Rodriguez informed the district court that they were comfortable with the factual basis, noted they vigorously disagreed over the legal significance of Rodriguez's purported lack of knowledge about the presence of methamphetamine in the Suburban, and indicated the matter should be resolved at sentencing. After highlighting this issue for Rodriguez and informing him the potential sentence he faced could be widely different depending on the contested legal significance of his lack of knowledge of the methamphetamine, the district court accepted Rodriguez's guilty plea.

After extensive briefing by the parties, the district court held a two-phase sentencing hearing to resolve whether *Apprendi* made Rodriguez's knowledge of

the methamphetamine an essential element of the sentencing provisions of 21 U.S.C. § 841(b). The district court ultimately concluded that although the type and amount of drugs could be an essential element of an enhanced sentence under § 841(b), the type and amount of the drugs in the Suburban were not contested by Rodriguez. The district court further concluded § 841(b) did not contain a *mens rea* element regarding the *quantity or type* of drugs (i.e., although 21 U.S.C. § 841(a) contained a *mens rea* element regarding a defendant's knowledge of the presence of illegal drugs, § 841(b) did not contain a *mens rea* element as to the quantity and type of drugs present), and *Apprendi* did not dictate a different interpretation of § 841(b). Accordingly, the district court concluded Rodriguez's purported lack of knowledge of the presence of methamphetamine in the Suburban was legally insignificant and calculated Rodriguez's sentence with reference to the methamphetamine.

Rodriguez appeals, contending *Apprendi* and *Jones* mandate his sentence be calculated solely with reference to the marijuana found in the Suburban because the factual basis of his guilty plea did not contain any reference to his knowledge of the presence of methamphetamine.

### III. ANALYSIS

*A. The Roadside Stop*

-10-

*1.  Scope of the Detention*

In reviewing the denial of a motion to suppress, this court accepts the factual findings of the district court unless they are clearly erroneous. *United States v. Botero-Ospina*, 71 F.3d 783, 785 (10th Cir. 1995) (en banc).  "We view the evidence on appeal in the light most favorable to the government." *Id.*  The ultimate determination of reasonableness under the Fourth Amendment is a question of law subject to *de novo* review.  *Id.*

The Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  "Because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, we have routinely analyzed such stops under the framework announced in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Holt*, 264 F.3d 1215, 1228 (10th Cir. 2001) (en banc).  "Under *Terry*, we determine the reasonableness of a search or seizure by conducting a dual inquiry, asking first whether the officer's action was justified at its inception, and second whether it was reasonably related in scope to

the circumstances which justified the interference in the first place." *Id.* (quotations omitted).

Briseno and Rodriguez first contend the initial stop by Jones did not support any contact with either of them. In essence, they argue that because they did not violate any Wyoming laws regarding the placement of the temporary registration, and because that fact was clear the minute Jones walked in sight of the temporary registration, Jones was obligated to terminate the encounter immediately. The problem with this argument, however, is that Briseno and Rodriguez never raised it before the district court. Instead, as specifically noted by the district court, they did "not challenge the initial stop *or the subsequent issuance of a warning for failure to properly display the vehicle registration*." D. Ct. Order at 6 (emphasis added). Having failed to challenge before the district court the propriety of the warning for failing to properly display the vehicle registration, Briseno and Rodriguez cannot now assert on appeal that Jones was obligated to immediately terminate the encounter because the temporary registration was properly displayed. *See United States v. Anderson*, 374 F.3d 955, 958 (10th Cir. 2004).

In the alternative, Briseno and Rodriguez assert Jones impermissibly extended the duration of the stop for reasons unrelated to the purpose of the stop. In support of this contention, they rely primarily on this court's decision in *United*

-12-

*States v. McSwain*, 29 F.3d 558 (10th Cir. 1994). Their reliance on *McSwain* is, however, seriously misplaced. In *McSwain*, a trooper stopped the defendant "for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker." *Id.* at 561. As soon as the trooper approached the vehicle, he observed that the temporary registration was valid. *Id.* The trooper nevertheless approached the vehicle and questioned the defendant about his travel plans and requested the defendant's license and registration. *Id.* This court concluded the trooper's actions violated the Fourth Amendment. *Id.* at 561-62 ("Having no objectively reasonable articulable suspicion that illegal activity had occurred or was occurring, [the trooper's] actions in questioning [the defendant] and requesting his license and registration exceeded the limits of a lawful investigative detention and violated the Fourth Amendment." (quotations, alterations, and citation omitted)).

This case, unlike *McSwain*, involved a traffic violation. The temporary registration was improperly displayed, a matter Briseno and Rodriguez did not contest before the district court. Jones issued the defendants a warning for the improper display. As *McSwain* makes clear, it is well established in this Circuit that an officer conducting a routine traffic stop may inquire about identity and travel plans, request a driver's license and vehicle registration, and run a computer check, as long as at the time the officer does so he or she "still has

some objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." *Id.* (quotations omitted). Accordingly, Briseno and Rodriguez are simply wrong in asserting that, under the facts of this particular case, Jones was required to terminate the encounter as soon as he realized the temporary registration was valid.

Nor were Jones' actions between the initiation of the stop and the return of Briseno's and Rodriguez's travel documents improper. Instead, those actions were "reasonably related in scope to the circumstances which justified the [stop] in the first place." *Holt*, 264 F.3d at 1228 (quotation omitted). As noted above, *McSwain* makes clear that officers are entitled to inquire about identity and travel plans, request a driver's license and vehicle registration, and run computer checks, as long as there exists reasonable suspicion that a traffic violation has occurred or is occurring. 29 F.3d at 561. Here, the district court found that process took no more than nineteen minutes to complete and that there was no evidence in the record that Jones was stalling in the performance of these routine tasks. D. Ct. Order at 6. Like the district court, we conclude this time frame is reasonable in light of the need to complete checks on both Briseno and Rodriguez and the fact that dispatch may be assisting as many as twelve troopers at any given time. *See id.* Accordingly, this court rejects Briseno's and Rodriguez's contention that Jones impermissibly extended the duration and scope of the stop.

-14-

*2. Validity of the Consent*

Briseno and Rodriguez assert that the consent for Jones to search the Suburban was not voluntarily given. "A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). A court must consider the totality of the circumstances to determine whether the officer's conduct would have communicated to a reasonable person that he was free to terminate the encounter of his own volition. *United States v. Elliott*, 107 F.3d 810, 813-14 (10th Cir. 1997). "In determining whether a consent to search was free from coercion, a court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant." *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998) (quotation omitted). Finally, it must be noted that "[b]ecause voluntariness is a question of fact, [this] court must accept the district court's finding unless it is clearly erroneous." *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000).

In asserting that their consent to Jones' search of the Suburban was not voluntary, Briseno and Rodriguez argue as follows: (1) Jones testified at the suppression hearing that he would have continued to detain them even had they

not consented to the search because he believed he had reasonable articulable suspicion of wrongdoing; (2) they were separated from their traveling companion during the interaction with Jones; (3) the presence of a number of officers on the scene was coercive; (4) Jones leaned into the Suburban when he asked Briseno for consent to search; and (5) Briseno's grasp of English is too limited to have given valid consent. For those reasons set out below, this court finds these arguments unconvincing.

In contrast to the defendant's assertions on appeal, Jones' *unexpressed* subjective views about whether he had a sufficient legal basis to hold them if they refused to consent to a search of the Suburban are irrelevant to the question whether the consent was free of coercion. This is especially true in light of the district court's finding that there was nothing coercive or forceful in the manner in which Jones interacted with Briseno and Rodriguez. For instance, the district court specifically found that Jones leaned into the Suburban simply to facilitate conversation with Briseno, who was seated in the back seat of the Suburban. Because Jones did not express, either through word or deed, that he intended to continue detaining the defendants had they declined consent to search the Suburban, Jones' subjective intent is irrelevant to the question whether Briseno's consent was voluntary.

-16-

The remainder of Briseno's and Rodriguez's contentions are equally unavailing. The separation of Briseno from his traveling companion was of a limited duration, lasting no more than twenty minutes. In addition, the district court rejected the assertion that Briseno could not understand English, finding that "[t]here is no evidence to support a finding that the Defendants did not understand what Trooper Jones was asking them." D. Ct. Order at 7. Finally, we agree with the district court that the presence of other officers on the scene did not create a coercive environment. The district court specifically found that although three other troopers eventually joined Jones at the scene, only one of those officers came near Briseno prior to the search. None of the troopers unholstered his firearm or displayed any show of force. In sum, the defendants have not identified anything in the record demonstrating that the district court's conclusion that Briseno voluntarily consented to the search of the Suburban is clearly erroneous.

*B. Rodriguez's Sentence*

Rodriguez contends on appeal that the district court erred in calculating his sentence on the basis of the methamphetamine found in the Suburban because the factual basis of his plea did not include a statement that he knew the methamphetamine was in the vehicle. Rodriguez's argument can be summarized as follows: after the Supreme Court's decision in *Apprendi*, § 841(b) must be read to include a requirement that before the enhanced penalties apply, a defendant must know of both the type and quantity of illegal drugs in his possession. The proper interpretation of § 841(b) under *Apprendi* is a question of law this court reviews *de novo*. *United States v. Jackson*, 240 F.3d 1245, 1247 (10th Cir. 2001).

"The language of the statute is the starting place for any inquiry into a criminal statute's *mens rea* requirements." *United States v. King*, 345 F.3d 149, 152 (2d Cir. 2003) (quotation and alterations omitted), *cert denied*, 540 U.S. 1167 (2004); *see also United States v. Nava-Sotelo*, 354 F.3d 1202, 1204 (10th Cir. 2003) ("In interpreting a statute, we begin with the plain language of the statute itself." (quotation omitted)). Although § 841(a) contains a specific *mens rea* requirement, no such requirement is set out in § 841(b). *Compare* 21 U.S.C. § 841(a) ("Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . ."), *with id.* § 841(b) ("Except as otherwise provided in . . . this title, any person who violates subsection (a) of this section

-18-

shall be sentenced as follows . . . .").  Prior to the Supreme Court's decision in *Apprendi*, courts routinely held that § 841(b) imposed a strict liability punishment scheme based solely on the type and quantity of drugs possessed by the defendant and that a defendant's knowledge of the type and quantity was not relevant to the sentencing decision.  *See, e.g.*, *United States v. Valencia-Gonzalez*, 172 F.3d 344, 346 (5th Cir. 1999); *United States v. Strange*, 102 F.3d 356, 361 (8th Cir. 1996); *United States v. Salazar*, 5 F.3d 445, 446 (9th Cir. 1993); *United States v. Collado-Gomez*, 834 F.2d 280, 281 (2d Cir. 1987).  Rodriguez nevertheless argues that the Supreme Court's decision in *Apprendi*, wherein the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," mandates that § 841(b) be reinterpreted as containing a *mens rea* requirement.  530 U.S. at 490.

The problem with Rodriguez's argument is that his knowledge of the type and quantity of drugs that he was carrying is not a fact that increases his punishment.  This is so because knowledge is not an element of the sentencing enhancements set out in § 841(b).  Instead, the only elements of the enhanced crimes set out in § 841(b) are the type and quantity of drug possessed.  Each of the nine circuits to have considered this issue post-*Apprendi* has so held.  *King*, 345 F.3d at 152-53 (holding that § 841(b) does not contain a *mens rea*

requirement and noting "the language of § 841 clearly conveys Congress's intent to subject drug dealers to the enhancements provided in § 841(b) regardless of their awareness of drug type and quantity"); *United States v. Browner*, 336 F.3d 274, 276-77 (4th Cir.) (holding that *Apprendi* did not change the government's *mens rea* burden under § 841 and "the defendant's knowledge with regard to the exact nature, or for that matter the exact amount, of a controlled substance is not a fact that increases the penalty under § 841(b)"), *cert. denied*, 540 U.S. 936 (2003); *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (holding *Apprendi* does not require proof of knowledge as to type or quantity of drugs); *United States v. Gamez-Gonzalez*, 319 F.3d 695, 699-700 (5th Cir.) ("Knowledge of drug type and quantity is not, in the words of *Apprendi*, a 'fact that increases the [§ 841(b)] penalty.'" (emphasis omitted)), *cert. denied*, 538 U.S. 1068 (2003); *United States v. Carranza*, 289 F.3d 634, 644 (9th Cir. 2002) (*"Apprendi* did not change the long established rule that the government need not prove that the defendant knew the type and amount of a controlled substance that he imported or possessed; the government need only show that the defendant knew that he imported or possessed some controlled substance." (emphasis omitted)); *United States v. Collazo-Aponte*, 281 F.3d 320, 326 (1st Cir. 2002) ("The plain language of § 841(b) requires the government to prove only that the offense 'involved' a particular type and quantity of drugs, not that the defendant knew that he was

distributing that particular type and quantity." (emphasis omitted); *United States v. Barbosa*, 271 F.3d 438, 458 (3d Cir. 2001) (same); *United States v. Carrera*, 259 F.3d 818, 830 (7th Cir. 2001) (same); *United States v. Sheppard*, 219 F.3d 766, 768 n.2 (8th Cir. 2000) (same). We agree with the other circuits that have considered the question and conclude there is nothing in *Apprendi* that mandates importation of a scienter requirement into § 841(b). Thus, the district court correctly calculated Rodriguez's sentence with reference to the methamphetamine found in the Suburban.

Contrary to Rodriguez's assertions, this rule is not inconsistent with this court's opinion in *Jones*. In *Jones*, this court simply held that "the quantity of drugs involved in a violation of § 841 is an essential element of the offense if that fact exposes the defendant to a heightened maximum sentence under § 841(b)(1)(A) or (B)." 235 F.3d at 1236. There is nothing at all in *Jones* to indicate that *Apprendi* requires the imputation of a *mens rea* into § 841(b). In this case, Rodriguez admitted methamphetamine was found in the Suburban and did not contest the quantity found. Accordingly, the rule set out in *Jones* is satisfied here.

## IV. CONCLUSION

-21-

For those reasons set out above, the order of the district court denying Briseno's and Rodriquez's motion to suppress is **AFFIRMED**. Rodriguez's

sentence is likewise **AFFIRMED**.

Entered for the Court


Michael R. Murphy
Circuit Judge